STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

ROSS WEINGARTEN (NYBN 5236401)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Ross.weingarten@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>CELIN DAVID DOBLADO-CANACA,<br><br>    Defendant. | NO. CR 21-00416 JD<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Sentencing Date:  November 21, 2022<br>Sentencing Time: 10:30 a.m. |

On the night of May 18, 2020, an individual, M.G., drove from San Bruno, California to the Tenderloin to purchase drugs. There, he met with the defendant, Celin David Doblado-Canaca, a homeless, street-level drug dealer, who sold M.G. $60 of a white powdery substance that M.G. believed was cocaine. M.G. then drove back to San Bruno and gave the supposed cocaine to his acquaintances, Victim 1 and Victim 2, who ingested the powder in their car. Tragically, the powder they snorted was laced with fentanyl, an extremely potent and deadly opioid. The consequences were devastating. Victim 1 tragically died of an overdose; Victim 2 overdosed as well but miraculously survived.

    The next day, law enforcement arrested M.G., who informed officers that he purchased the deadly drugs from a dealer in the Tenderloin named "David," who turned out to be the defendant. On

May 20, 2020, M.G. and an undercover officer ("the UC") again purchased drugs from Doblado-Canaca, this time as part of a law enforcement operation. Doblado-Canaca sold three small Ziplock bags of what he knew to be fentanyl to the UC for $60. Doblado-Canaca was arrested shortly thereafter, and found with 8 more baggies of fentanyl and 13 plastic twists of heroin on his person.

Doblado-Canaca pled guilty to distribution of fentanyl for selling drugs to M.G. on May 20, 2020 pursuant to a binding plea agreement under which he will serve a prison sentence of 4 to 6 years, depending on the Court's discretion. However, in his plea agreement, he admitted selling the drugs that ultimately killed Victim 1 and almost killed Victim 2. The government understands and appreciates the Court's hesitance to accept binding plea agreements, but believes that in this unique and heartbreaking case, for the reasons described below, a binding plea agreement to a range of 4-6 years was the most appropriate outcome for this defendant, for the victims, and for the community at large. The government agrees with Probation's recommendation of a sentence of 72 months, or 6 years, followed by three years of supervised release on the conditions Probation recommends (including the enhanced search provisions), and restitution of $4,704.41.

I.      **BACKGROUND**

As described more fully in the Presentence Investigation Report (PSR), Doblado-Canaca is a Honduran national illegally in the United States who, at the onset of the Covid pandemic in May 2020, was a homeless drug dealer in the Tenderloin. On May 18, 2020, M.G. purchased $60 of what M.G. believed to be cocaine from Doblado-Canaca. M.G. then returned to San Bruno and gave the drugs to Victim 1 and Victim 2, who he had known previously. Victim 1 and Victim 2 ingested the powder, believing they were snorting cocaine before a social evening. Unfortunately, what they ingested was not cocaine but rather fentanyl, an extremely dangerous and deadly opioid that can cause death in even tiny amounts.

Early the next morning, a family member found Victims 1 and 2 unresponsive in their car. Emergency services arrived, and pronounced Victim 1 dead at the scene. Victim 2 was rushed to the hospital and, thankfully, survived the overdose. Inside the car, a small plastic baggie containing a white powdery substance was found. That powder tested positive for the presence of fentanyl. An autopsy confirmed that Victim 1's cause of death was an accidental overdose of fentanyl and cocaine.

Victim 2 told law enforcement that M.G. provided them with the drugs, and law enforcement immediately located and arrested him. M.G. in turn told officers that he had purchased the drugs from a man he knew as "David" in the area of Golden Gate Avenue and Hyde Street in San Francisco. M.G. had "David's" phone number, and so M.G. called "David" to set up another deal. On May 20, 2020, two days after Victim 1's death, M.G. and an undercover officer met with "David" – who turned out to be the defendant, Doblado-Canaca – in the Tenderloin. The UC purchased three Ziplock baggies of fentanyl from Doblado-Canaca for $60, and Doblado-Canaca confirmed during the purchase that he knew he was selling fentanyl (as opposed to cocaine or another drug). After completing the transaction, Doblado-Canaca walked away and was seen by law enforcement engaging in another hand-to-hand drug deal.

Doblado-Canaca was then detained by officers and searched. On his person, officers found 8 additional Ziplock baggies of fentanyl, along with 13 plastic twists containing heroin. He was released by officers but arrested on August 21, 2020 and charged in connection with this case. He has been in custody since then.

//

## II.  THE GUIDELINE CALCULATIONS AND THE PLEA AGREEMENT

Probation calculates Doblado-Canaca's offense level as follows:

| Base Offense Level, U.S.S.G. § 2D1.1(a)(2) | 38 |
|---|---|
| Acceptance of Responsibility, U.S.S.G. § 3E1.1 | -3 |
| Adjusted Offense Level | 35 |

The parties' resolution is not based on the Sentencing Guidelines, and the parties did not come to agreement on the base offense level in the Plea Agreement.  Nonetheless, the Court still must calculate the applicable Sentencing Guidelines range, if only to provide a reference point in determining whether to accept the parties' binding agreements. *Hughes v. United States*, 138 S. Ct. 1765, 1773 (2018) ("In deciding whether to accept an agreement that includes a specific sentence, the district court must consider the Sentencing Guidelines.").

The base offense level in a drug case normally is determined by the aggregate weight of the drugs attributable to the defendant.  U.S.S.G. § 2D1.1 applic. notes 5, 7.  Because the fentanyl that Doblado-Canaca sold to M.G. on May 20, 2020 contained a collective total of approximately .748 grams of fentanyl and he possessed 2.866 grams of fentanyl when he was arrested, the base offense level would be 12.  *Id*. § 2D1.1(c)(14) (less than four grams of fentanyl).  If that offense level were to apply, and the defendant received two points off for acceptance of responsibility, his applicable Guidelines range would be 10-16 months as he falls in Criminal History Category III.

However, the Guidelines also provide specific base offense levels where the drug distribution resulted in death or serious bodily injury.  *Id*. §§ 2D1.1(a)(1)-(4).  Section 2D1.1(a)(2) provides for a base offense level 38 where the defendant is convicted under 21 U.S.C. § 841(b)(1)(C), and where "the offense of conviction establishes that death or serious bodily injury resulted from the use of the substance."  Probation concludes that § 2D1.1(a)(2) applies. *See, e.g.*, PSR ¶ 32; PSR Addendum ¶¶ 10-12.

Doblado-Canaca admitted in his plea agreement that he sold narcotics to M.G., which were then provided to Victim 1 and Victim 2 and caused them to overdose, resulting in Victim 1's death. Although the parties did not agree on a base offense level by stipulation in the plea agreement, the

US SENTENCING MEMORANDUM           4

government believes that Probation's interpretation and application of § 2D1.1(a)(2) is reasonable.

### III. DISCUSSION

#### A. Legal Standards

The Court should impose a sentence sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also* 18 U.S.C. § 3553(a). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the advisory Guidelines. *Id*.

After determining the appropriate advisory Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness considering the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93. Under Section 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; (4) the need for the sentence imposed to protect the public from further crimes of the defendant; and (5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

#### B. Sentencing Recommendation

The United States agrees with Probation's recommendation that the Court impose a sentence of 72 months' imprisonment, 3 years of supervised release, and restitution of $4,704.41.

##### 1. The nature of the offense/history and characteristics of the defendant

This case, like so many other similar cases involving fentanyl, is heartbreaking for everyone involved. Victim 1 did not deserve to die. On May 18, 2020, he was with friends and family and believed he was doing a line of cocaine before a social evening. Like so many thousands of others in our community, he accidentally ingested fentanyl and never woke up. The letters submitted by his family show Victim 1 to be a "protector and a friend" who was "loving and caring." It is clear that his

family has suffered tremendously from his death, and unfortunately nothing can be done to ease their heartbreak. This is to say nothing of Victim 2's near-death experience, which was also caused by a fentanyl overdose. There is no question that Doblado-Canaca must be punished appropriately for selling the drugs that caused this immense harm to two individuals and countless family members and friends.

But it is also true that the defendant's experience is heartbreaking as well. As explained in the PSR, he grew up in poverty in Honduras and dropped out of school after the fourth grade to help his family earn money. Doblado-Canaca was assessed for competency in connection with these charges. A psychologist hired by the defense found that he has "impaired intellectual functioning" that impedes his ability to effectively consult with counsel, and thus his capacity to stand trial. A BOP report found that Doblado-Canaca was competent to stand trial, but noted that he has "below average cognitive abilities" and a "clinically significant pattern of opioid use." In terms of his role in the crime, the government has no evidence to suggest Doblado-Canaca laced the cocaine with fentanyl himself, nor did he import it into our community. The individuals who are primarily to blame for this dangerous situation will, unfortunately, not face justice for Victim 1's death and the deaths of so many others.

There is little doubt that Doblado-Canaca's conduct here—selling fentanyl in the Tenderloin, which made its way into the hands of a user in San Bruno who overdosed and died—is extremely serious. Doblado-Canaca admitted his conduct and accepted that he will be a convicted felon required to spend a significant amount of time in prison. Moreover, he will be deported upon completion of his sentence and it is very unlikely he will be legally allowed to reenter the United States again. Finally, general deterrence is an important factor in this case—the community must understand that fentanyl is extraordinarily dangerous, and selling it, even in small amounts, comes with serious consequences. But it is impossible to ignore the defendant's impoverished background, dire situation, and his role as a street-level dealer rather than an organizer or importer of drugs. Doblado-Canaca did not intend for anyone to die when he sold $60 worth of drugs to M.G., and while that does not excuse his conduct, it does suggest that a much longer sentence would not serve the interests of justice in this case.

2. **Just punishment and adequate deterrence**

The parties entered a binding plea agreement under which Doblado-Canaca will serve between 48-72 months in prison, depending on what the Court thinks is appropriate. This range was not an

US SENTENCING MEMORANDUM          6

attempt to place a value on Victim 1's life. No sentence can make up for the loss of Victim 1, and Doblado-Canaca will have to live with what he has done for the rest of his life. Rather, the range represents an attempt to account for the defendant's culpability in this case.

While Doblado-Canaca did not intentionally cause Victim 1's death, his death was the product of Doblado-Canaca's reckless disregard for human life. Every time fentanyl is sold illegally, lives are put at risk. It is like playing a game of Russian roulette, where a user (or even someone who comes in close contact with the fentanyl) can overdose and die at any moment. It's that toxic. And while there is not proof in this case that Doblado-Canaca knew what he sold to M.G. was fentanyl, he did know that what he sold to the UC two days later was fentanyl, thus confirming that Doblado-Canaca was not under the mistaken impression that he was selling cocaine or another drug.

Fentanyl – even in very small quantities -- is the most dangerous drug to afflict the community in decades. The drug typically is dosed in micrograms (millionths of a gram).[1] A dose of 2,000 micrograms – just 2 milligrams (0.002 g) – is usually fatal to those without opioid tolerance.[2] Even the small amount contained in the powder Doblado-Canaca sold M.G. can be—and in this case was, lethal. To appreciate just how little a fatal dose of fentanyl is, on its website, the DEA has the following depiction of what 2 milligrams looks like:[3]



The agreed-upon sentence of 48-72 months' incarceration is thus necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. Further, it is meant to afford both specific deterrence to the defendant and to send a message to others that recklessly distributing fentanyl will have significant consequences. A significant sentence is thus required to

---

[1] *See* https://www.drugs.com/illicit/fentanyl.html, last visited August 10, 2022.
[2] *See* https://www.dea.gov/sites/default/files/2021-12/DEA-OPCK_FactSheet_December%202021.pdf.
[3] *See* Drug Fact Sheet: Fentanyl (dea.gov).

**US SENTENCING MEMORANDUM**             7

achieve the goals of both general and specific deterrence.

By pleading guilty to a fentanyl distribution offense, Doblado-Canaca also accepted responsibility for distributing fentanyl to Victim 1. He admitted in the factual basis of the plea agreement that his drug trafficking caused Victim 1 to fatally overdose. His decision to plead guilty prior to trial, paired with this Court's sentencing decision, will provide the victim's family with closure and a greater ability to grieve their profound losses on their own terms, without having to re-live their painful memories at a trial in open court. Defendant's early decision to accept responsibility will also allow the United States to conserve its investigative resources in this case and redirect its efforts toward identifying and prosecuting other dealers of dangerous drugs like fentanyl, and seeking justice on behalf of other victims and their families. Doblado-Canaca's plea and his admissions forces him to confront the awful consequences of his actions in ways the government hopes will make him less likely to sell fentanyl ever again.

### 3. Need to avoid unwarranted sentencing disparities

The need to avoid unwarranted sentencing disparities among similarly situated defendants also counsels a substantial custodial sentence. Undersigned government counsel is aware of seven other recent defendants in this district whose drug overdose cases have publicly gone to sentencing and judgment. *See, e.g.*, *United States v. Pascoe*, No. 22-CR-25 WHA (pursuant to a Rule (c)(1)(C) plea agreement, the defendant received a 60 month sentence after selling a counterfeit pill laced with fentanyl to a former classmate); *United States v. Xavier Jimenez Robledo*, No. 21-CR-114 BLF (pursuant to a Rule (c)(1)(c) plea agreement, sentencing defendant—repeat fentanyl dealer who trafficked in pills he knew contained fentanyl—concurrent 96- month sentences on two counts of distribution for sales where two of his customers overdosed and one of them died); *United States v. Rodolfo Rivera-Herrera*, No. 15-CR-579 VC (pursuant to a Rule 11(c)(1)(c) plea agreement and subject to a ten-year mandatory minimum sentence, sentencing defendant – a full-time heroin dealer who managed his own distribution cell – to 145 months' imprisonment for his role distributing 8000 grams of heroin in a large-scale heroin conspiracy, one gram of which was sold to a customer who overdosed and died); *United States v. Shane Cratty*, No. 19-CR-681 CRB (pursuant to a Rule 11(c)(1)(c) plea agreement, Court imposes 96-month sentence for selling a gram of fentanyl to a man who used it and whose 13-month-old son also ingested

it and they both died as a result); *United States v. Lindsay Williams (Muniz)*, No. 19-CR-681 CRB (pursuant to a Rule 11(c)(1)(c) plea agreement, Court imposes 90-month sentence for selling a gram of fentanyl in the same transaction as defendant Shane Cratty), and *United States v. Susan Arreola-Martin*, No. 19-CR-20-108 JD and No. 21-CR-445 JD (pursuant to a Rule 11(c)(1)(c) plea agreement, Court imposes 84-month sentence for engaging in mortgage fraud scheme and for giving fentanyl to granddaughter while on pretrial release, leading to granddaughter's death).

The *Pascoe* case is particularly instructive. In that case, Judge Alsup sentenced the defendant to a 5-year sentence after the defendant sold a counterfeit pill laced with fentanyl to a classmate. The plea agreement in that case called for a binding range of 5-7 years. While the facts of this case are slightly different, the overall conduct remains the same: selling a drug that is laced with fentanyl to an unsuspecting customer and causing an accidental overdose death. A similar result is appropriate here.

California law also provides helpful guidance in determining an appropriate sentence in this case. The Penal Code provides a 4, 6, and 10-year sentencing triad for gross vehicular manslaughter with intoxication. Cal. Penal Code § 191.5(c)(1). The triad for voluntary manslaughter is 3, 6 or 11 years. Id. § 193(a). Both crimes require *mens rea* similar to that of the defendant here. Gross vehicular manslaughter requires a showing of gross negligence, which means the defendant acted in a reckless way that created a high risk of death or great bodily injury, and that the defendant knew her/his acts created that risk. Cal. Crim. Jury Instr. 590. Voluntary manslaughter can be charged where the defendant acted with conscious disregard for life and the defendant's act caused someone's death. People v. Bryant, 56 Cal. 4th 959, 968 (2013) ("A defendant commits voluntary manslaughter when a homicide that is committed either with intent to kill or with conscious disregard for life—and therefore would normally constitute murder—is nevertheless reduced or mitigated to manslaughter."); Cal. Crim. Jury Inst. 572.

Doblado-Canaca acted with something akin to gross negligence, in particular, when he sold fentanyl to M.G., which ended up in the hands of Victim 1 and caused his death. He dealt a deadly drug that is responsible for thousands of deaths in our community, but it was Victim 1 who suffered the consequences. A sentence of 72 months incarceration is sufficient, but not greater than necessary, to protect the public from further crimes he may commit. Doblado-Canaca's reckless distribution of this

US SENTENCING MEMORANDUM    9

powerful and deadly drug, and his lack of appreciation for the risks associated with distributing fentanyl, generally warrants a significant sentence to protect the public. On the other hand, the mitigating factors in this case, including but not limited to Doblado-Canaca's own impoverished upbringing and life in San Francisco, his role on the lowest level of the drug trafficking distribution ring, and the fact that there is no evidence that he intended to sell fentanyl to M.G., and certainly no evidence that he intended to do anyone harm, suggests that 72 months is not greater than necessary to achieve the goals of sentencing.

## IV.  CONCLUSION

This is a heartbreaking case, one that has caused untold harm to the victims and their families. But the defendant never intended to cause the harm he did, and was himself in a tragic situation on the day he sold fentanyl that would end up killing Victim 1. For the foregoing reasons, the government recommends that the Court sentence Doblado-Canaca to 72 months in prison, followed by 3 years of supervised release on the terms Probation recommends (including enhanced search provisions), and $4,704.41 in restitution.[4]

DATED: November 7, 2022

Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

 /s/ Ross Weingarten
ROSS WEINGARTEN
Assistant United States Attorney

---

[4] This restitution figure is based on the claim for funeral expenses submitted by Victim 1's family.